149 So. 867

### HALL v. DONNELLY et al.
### 6 Div. 452 and 452A.

Court of Appeals of Alabama.
June 6, 1933.

Rehearing Denied June 30, 1933.

Roderick Beddow and G. Ernest Jones, both of Birmingham, for appellant.

Ross, Bumgardner, Ross & Ross, of Bessemer, for appellees.

482

BRICKEN, Presiding Judge.

This cause involves the right to the custody of Mary Augusta Hall, a girl between four and five years of age. The father, William G. Hall, filed his petition in the nature of habeas corpus seeking the possession of his daughter, and alleged therein that she was being unlawfully detained by the respondents E. J. Donnelly and his wife, Anna Donnelly.

The respondents filed their answer which is as follows:

"Now come E. J. Donnelly and Anna Donnelly in the above styled cause and for answer to the writ of habeas corpus issued in this case say:

"That each denies that the said Mary Augusta Hall is unlawfully detained and imprisoned by them or either of them.

"For further answer each of the respondents says that Anna Donnelly was the sister of the mother of Mary Augusta Hall and that the mother of the said Mary Augusta Hall died during the infancy of the said Mary Augusta Hall. That at birth the said Mary Augusta Hall was underweight, sickly, and frail. That petitioner and his wife, the mother of said child, realizing the physical condition of said Mary Augusta Hall, requested respondent Anna Donnelly to take said child, nourish it, and, if possible, raise said child; and both petitioner and his said wife, believing that it would be to the best interest of said child that respondent Anna Donnelly should have the custody and control and raising of said child, agreed with respondent Anna Donnelly that if she would take said child and properly care for it and nourish it that said child should remain in the custody, care and control of respondent Anna Donnelly.

"Respondents further say that on account of the sickly condition of said child at birth, and in keeping with the agreement above set forth, they nourished, cared for, and have spent large sums of money for medicine, hospital bill and doctor's bills, in order to carry out their agreement with petitioner and petitioner's said dead wife. That ever since birth the said child has been in the care, custody and control of respondent; that they have cared for and treated it as a child of their own, and said child has become to look upon respondents as her parents, and that both respondents have become attached to said child to the same extent as if they had been father and mother respectively of said child.

"Respondents further say that they are able, willing and ready to continue to care for, support, and maintain said child as they have ever since the death of its mother; that respondents live in a community where the environments are of the best and both respondents say that it would be to the best interest and welfare of said child to remain in the custody, care and control of respondents."

Upon the trial the evidence was taken ore tenus, and the court rendered a decree awarding the custody of the child to petitioner for a period of nine months in each year, that is to say, from September 1st to June 1st, and the custody and control of the child was awarded to its Aunt, Mrs. E. J. Donnelly, respondent, for the remaining three months of the year; that is to say, from June 1st to September 1st. The decree also provided that the party out of possession shall have the right to visit the child at reasonable times, and also the right to have her visit such party out of possession on week-ends at reasonable intervals.

Neither party to the proceedings was satisfied as to the decree rendered, and both the petitioner and respondents took an appeal to this court.

In a case of this character the rule is that a presumption should be indulged in favor of the conclusion reached by the trial judge, for the reason he had the opportunity of seeing and observing the witnesses and of hearing their testimony; but this court (en banc), after having read and considered the entire record and also the briefs of counsel for both parties, are clear to the conclusion that in this case this general presumption cannot prevail. We are unanimous in the conclusion that a dual right of custody of the child in question would not be conducive to its welfare and that such an award would be susceptible of irreparable injury and detriment to this little ward of the state. This is so clear and manifest from the facts and conditions as shown by the record we deem it unnecessary to elaborate or particularize by further discussion. As a consequence of the foregoing, we must perforce award the sole custody of the child in question to one of the parties to this proceeding and this duty is indeed delicate and highly responsible. Impulses of the human heart are never more involved than in cases of this character where a decision must be rendered deciding which of the respective parties is to have possession of the little child very dear to them all. In the instant case the facts are such as to render a decision difficult in the extreme. On the one hand, the father petitions the court for the possession and custody of his child and relies upon the general rule of law to the effect, "A parent is entitled to the custody of his child unless good cause is shown for giving its custody to another." Montgomery v. Hughes et al., 4

Ala. App. 245, 58 So. 113. On the other hand, the respondents earnestly insist that the evidence in this case is overwhelmingly convincing that their custody of the child should not be disturbed. They contend, and insist, that the evidence shows without dispute or conflict that they have nurtured, cared for, and fostered this child continuously since it first saw the light of day, to the present time. All this in line with the finding of the court below wherein the decree stated: "In the instant case the respondent, Mrs. Donnelly, a sister of the child's deceased mother, received the child upon the death of its mother and has maintained such possession to the present time. The birth of the child was premature and artificial, at which time the mother died. The infant weighed at birth a little over three pounds and that it would live was doubtful. The child's aunt constantly watched and nursed its feeble spark of life, giving it every possible service and attention that love could suggest, and this through a period of its life that required not only the most exacting and diligent service, but also a constant study of its nature and needs."

 The general rule relied upon by petitioner, as above stated, is in no sense exclusive, for the primary and controlling question in controversies affecting custody of an infant is the interest and welfare and good of the child. Murphree v. Hanson, 197 Ala. 246, 72 So. 437. In other words, a father is not as a matter of right entitled to obtain possession of his infant child on a writ of habeas corpus; the court being clothed with a sound discretion to grant or refuse relief according to the benefit to be derived to the infant. In the case of Kirkbride v. Harvey, 139 Ala. 231, 35 So. 848, 849, the court said: "When an infant child or minor is out of the possession and custody of the father, and habeas corpus is resorted to by the latter to obtain such custody, it does not follow as a matter of right, that the prayer of the petition will be granted. The court is clothed with a sound discretion to grant or refuse relief, always to be exercised for the benefit of the infant primarily." The facts in this Kirkbride v. Harvey Case are very similar to the instant case. In said case it is held that though a father is financially able he should not be granted custody of his daughter five and a half years old and of delicate constitution, it being at least doubtful whether he is qualified to look after her welfare, and her mother's sister and brother-in-law with whom she has been for four years since her mother's death being able and qualified. And in the Kirkbride Case the custody of the child was refused the father and awarded to its aunt and to its uncle by marriage. The child in the Kirkbride Case was of very delicate constitution, as is the child in the case at bar. The court in the Kirkbride Case held that it was to the best interest of the child that its aunt and uncle retain its custody. Bradley v. Bennett, 168 Ala. 240, 53 So. 262, 263. In Phelps v. McLeod, 17 Ala. App. 480, 86 So. 150, the court said: "While courts recognize the right of the father to the custody and control of his minor children, he being otherwise a fit and proper person, all the courts agree that the prime consideration in determining the question as between a father and other persons *is the permanent good of the child.*"

In Bradley v. Bennett, supra, the court said: "The mere fact of the paternity as a rule entails but small trouble or inconvenience, and should not be allowed to overturn weightier considerations."

██ In the exercise of the discretion with which this court is clothed, we are to be governed by what in our deliberate judgment is the best interest of the little child in question, recognizing of course the rule to the effect that the natural right of the father is not to be arbitrarily disregarded. After mature, thoughtful, and careful consideration, we are clear to the conclusion that the custody of the child should remain where it has been all of the child's life. There can be no speculation as to its future welfare if left to the foster parents, Mr. and Mrs. Donnelly. For their actions in the past in connection with the child are beyond any and all question an absolute guaranty and assurance as to the child's future. The records show that Mr. Donnelly is a recognized business man of prominence and stability, owns a modern home, and is in a position to accord to the child every worldly requirement. That he is willing and exceedingly anxious so to do is shown by the record, for there it clearly appears that his love and affection for the little girl is unquestioned and such as he could only bestow upon a child of his own. As to the foster mother, the maternal aunt, the record speaks only of her undying love and affection for the child. As stated, it would appear from the undisputed facts that the fact the child is living is due to the wonderful love and affection and unselfish and untiring efforts upon the part of this good woman. During its whole life she has given it the kindest and most affectionate treatment, caring for its wants, in every way, and treating it as tenderly and lovingly and providing for it as if it were her own child. It follows, of course, that the little girl has become very dear to her heart during the long months and years she and her good husband have cared for and nursed it from dire sickness to practically good health. The child itself, whose mother died at its birth, is exceedingly fortunate in having been placed by its mother and father in the hands of these manifestly excellent people, the cross-appellants.

Nothing derogatory need be said of the father, or the manifestly good woman that he

recently married. It is our opinion, however, from their environments and condition it would be utterly impossible for them, try as they may, to do and care for this still nervous immature child in the manner to which it has been accustomed and which appears necessary of continuation for the child's health and welfare generally. Mr. Hall, himself, owns no home, and but little, if any, other property. He has had but little, if any, experience in helping to raise children, and his good wife, now about 42 years of age, has never been a mother. It appears she is a business woman and is in the employment of a certain business concern in the city of Birmingham as a stenographer and bookkeeper and has been for several years. Until, or just before, the commencement of this proceeding the father has acquiesced in the possession and control of the child by Mr. and Mrs. Donnelly, and in this connection he has contributed but slightly to the care and attention necessary for the child's welfare.

The child's present home and surroundings are all that could be desired for any child. If allowed there to remain, its future health, happiness, and well-being is assured beyond all peradventure. We, therefore, have reached the conclusion that the judgment or decree of the lower court be reversed and a judgment here rendered awarding the sole possession, custody, and control of Mary Augusta Hall to appellants, upon the condition that petitioner and his wife shall have the right, if so desired, to visit the child at any reasonable time.

Reversed, and judgment rendered remanding the custody of the minor to respondents.

Reversed and rendered.

RICE, Judge (dissenting).

One of the commandments given to Moses on Mount Sinai, and one of the most beautiful, was: "Honor thy father and thy mother; that thy days may be long upon the land which the Lord thy God giveth thee."

I do not know the date when that command was delivered; but for many, many centuries it has been a guiding influence in the lives of untold millions of people. Very truly to my mind, it is time tested, and its inestimable value as a life motive fully proven. Whoever, or whatever, robs any child of the inspiration to be gained, of the comfort to be derived, from a faithful effort to live fully up to that sublime injunction, as I am persuaded, does that child a grievous wrong; a wrong that can be in no wise recompensed by any mere plethora of material comforts—by any mere superabundance of playthings, petting, and pandering.

There is no dispute here, as there was none before the learned circuit judge, as to the law. We are all agreed that it is stated correctly, fully, and as clearly as at any other place, in the two opinions by this court— one of which was written, however, by a Justice of the Supreme Court—in the case of Montgomery v. Hughes et al., 4 Ala. App. 245, 58 So. 113. As there written it has been over and over again approved by both the Supreme Court and this court. See Shepard's Citations, Alabama Reports.

Mutatis mutandis, the two opinions in the said Montgomery v. Hughes et al. Case speak exactly my sentiments with reference to the instant case, not only as to the law (which perforce they do), but as to the application of the law to the facts here involved.

Perhaps the opinion prepared by the Presiding Judge might not be called *unfair* in its reference to the father of the child whose future is here being dealt with; but, as *I* see it, it could have well been more explicit in its description of the type of man he was, of his environment, etc., of the woman he married— as appears, for the dominant, if not sole, purpose of procuring a competent stepmother for his little daughter. This, in order to counterbalance in a way the highly—and, be it said, properly written—commendatory references to appellees Mr. and Mrs. Donnelly.

I realize the futility, as a rule, of dissenting opinions. But, somehow, I will feel better if I may set down these facts; they being shown without dispute in the testimony:

1. The first three months of the child's life —those in which the spark of life *really* flickered—were spent in a *hospital*, under the care of skilled physicians and trained nurses. The father paid the bill.

2. The father—whatever be the truth as to his intending, and stating, as he admits he did state, that it was his intention, to let Mrs. Donnelly "raise" the child—never at any time gave the slightest evidence of any lack of paternal love for his little daughter.

3. Mrs. Donnelly gave the child every attention, as though it had been her own.

4. All the parties concerned are above reproach of any kind.

5. Everything was harmonious, pleasant, and beautiful to behold, until appellant Hall remarried.

6. The woman he married last—his present wife—is a mature woman, with education as a trained nurse; an admittedly fine character in every way; and a woman who the testimony in the record shows without dispute to be fitted in all respects to be a kind and loving stepmother to the child.

7. Appellant's present wife states a willingness and desire—and all, including, especially, Mr. Donnelly, express the utmost confidence in her—to give up her business occupation and assume the rôle of mother to this child.

8. Appellant Hall, a pharmacist, is shown —while not possessed, since the current

world wide "depression" took its toll, of any accumulated wealth—to have ample earning capacity to insure, reasonably, the material comforts to his child. In addition, his present wife has a considerable estate, all, as she affirms, at his disposal.

9. Neither Mrs. Donnelly nor the present Mrs. Hall have ever given birth to a child; though the present Mrs. Hall has "raised" at least one adopted child, to the age of some seventeen or eighteen years.

10. From the standpoint of physical care, attention, and comforts, the child would fare equally well either in its present home or with its father.

11. All praise may be accorded Mrs. Donnelly for the faithful and efficient attention she has hitherto bestowed upon the child.

12. But appellant *married;* then things rapidly became unpleasant. At first, appellant stated he would not take the child from Mrs. Donnelly, out of his own love and appreciation of her for her great kindness to both him and it. But he sought to have the child spend week-ends with him in his new home. More trouble—was it jealousy?

13. Anyhow, friction arose; appellant's present wife displayed a fine spirit, a big heart, and wonderful poise; *all* the parties were *friends.*

14. But Solomon was yet to be needed; arguments arose over the week-end visits, culminating in Mr. Donnelly, who is shown, though, throughout, to be a fine character, merely trying to solve an unsolvable problem, cudgeling appellant Hall around, in the immediate presence of his own child, and kicking him off his (Donnelly's) porch.

15. This was the straw (or the kick) that "broke the camel's back.". Hall went to court, asked for the custody of his daughter.

16. There is not one single thing shown in the evidence to disqualify Hall in any way from having the custody of his child. This is not disputed.

Then the law steps in, or *should*: " * * * the parent is not only under the sacred duty of providing and caring for his child, but that, in correlation of that duty, the parent is entitled to the care and custody of his child, *unless some good cause is shown why he should not have such care and custody.* [Italics mine.]" Montgomery v. Hughes et al., supra. This statement of the law is based upon the soundest of reasoning—all keeping in view the ever present lodestar of the "best interests of the child." See citations in majority opinion, and in this.

Providence has robbed this child of *one* parent; the decree ordered by my associates would rob it of the *other.* Nay, worse, because, as I see it, it would be vastly better for the child that its father be dead, rather than that the situation ordered by my associates obtain—where, from the very nature of the situation that has arisen, the child would not be taught, as the evidence in the record shows without dispute it *has* not recently been taught, to "Honor thy (its) father." And this father is shown likewise without dispute to be entirely *worthy* of honor.

To do this thing to this child would be in my opinion an irremediable wrong. See Gill v. Holdridge, 23 Ala. App. 398, 126 So. 176, where we were all agreed.

I therefore respectfully dissent.

On Rehearing.

SAMFORD, Judge.

I am concurring with the Presiding Judge, in awarding the custody of this child to the respondent, its maternal aunt, and in doing so I feel that it will not be amiss to state briefly my reasons.

It is a rule well recognized by all of the authorities that the right of parents to the custody of a child is not absolute. The state is the sovereign and in its capacity of parens patriæ may assume direction, control, and custody of the child and delegate its authority to whom it may seem fit. This power is to be exercised by the courts within a sound discretion, guided and governed by the rules of law; the controlling consideration in each case being the best interest of the child. Ex parte Shuptrine, 204 Ala. 111, 85 So. 494; McDaniel v. Youngblood, 201 Ala. 260, 77 So. 674.

Having assumed jurisdiction to award the custody of a child, any order or decree affecting its custody is subject to future control and modification by the court as subsequent conditions and circumstances may require for its welfare. Authorities, supra.

Another principle with which I am deeply impressed by a reading of many of the numerous decisions affecting the custody of children, is that in a large degree each case must be decided upon the facts of the particular cause then being tried, as those facts apply to the general rules of law governing in the premises.

The petitioner in this case, through his able and astute counsel, has sought to make it appear that the proceeding is an effort to take the custody of this child from the father and give it exclusively to the respondent aunt, when the facts disclosed by this record have exactly the opposite tendency.

The child, a girl now about four and one-half years old, was prematurely born and to live at all was required to be kept under artificial development for a period of three months and eleven days. During that period then it was in the hands of science and the hospital authorities, and those who were interested could do nothing but watch and wait. Three days after the premature birth the

young mother died, and so far as the child is concerned the father and relations awaited the development until such time as it could be taken away for future nurture as a child of normal birth. With the assent of the father it found its natural resting place in the arms and on the bosom of the loving sister of its mother. What else was there to do? To have left it then to the tender care of the father would have condemned it to a precarious existence and probably to death. Without the aid of courts or temporal judgment the natural love and affection of the parties and the surrounding circumstances fixed the custody in the maternal aunt, who was able and willing to assume the responsibility and burden of attending and nurturing the child through all the vicissitudes of infancy. Time moved on, the child grew and developed under the tender care of its aunt and with the consent of the father, who was still on good terms with the aunt and her husband and for a part of the time lived in the home with them.

After some years, the father sought another mate and jealousies and enmities began to arise between the father and his first wife's people, until the father remarried, and then there was an open breach resulting in a physical difficulty between the husband of the aunt and the father. Then followed a demand for the child and this proceeding. The second wife of the father may be, and doubtless is, a fine woman. She is, however, a stranger to the child and has for it none of that natural love and affection growing out of the ties of blood. To her the child is that of a strange woman who had the first and ardent love of her husband. However she might try, she could not take this child in her arms and feel the heart throbs of a dead sister or look into its baby eyes and see again the life of a loved one who had passed on in her pains to bring this child into being. The custody of this child, if awarded to this petitioner, would, according to the undisputed evidence, be in this stepmother. I may be wrong. My judgment I know is fallible, but I cannot bring myself to do it.

The pertinent facts in this case have been set out in the opinion prepared by the Presiding Judge, and I do not seek to reiterate them; but I am impelled to say that from a reading of this record, the impelling motive for this proceeding is not altogether the unselfish love of a father for a child. There are many facts which prompt me to say that if the welfare of the child had been the sole consideration, this suit could well have been avoided.

After a careful consideration of the whole case, I am impelled to concur in the opinion and the conclusion reached by the Presiding Judge.